**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

UNITED STATES OF AMERICA       CRIMINAL ACTION NO. 04-50133-01

                                      CIVIL ACTION NO. 08-0760

VERSUS                       JUDGE S. MAURICE HICKS, JR.

WILLIAM A. CAUSEY          MAGISTRATE JUDGE HORNSBY

## MEMORANDUM RULING

Before this Court is Defendant William A. Causey's ("Causey") Renewed Motion to Vacate his sentence and for an evidentiary hearing if the motion cannot be decided on the record. (Record Document 265). For the reasons that follow, the Court finds that Causey's trial counsel were not constitutionally ineffective, the Government did not violate the Brady rule, and Causey's Sixth Amendment rights to confrontation and to present a defense were not violated.

These findings are clear from the record and the briefings from both the Government and Causey. For this reason Causey's request for an evidentiary hearing is **DENIED**.

Accordingly, Causey's Motion to Vacate his sentence pursuant to 28 U.S.C. § 2255 is **DENIED**.

## BACKGROUND

In December of 2002, Causey and his homosexual partner, Scott Hitt ("Hitt"), invited a 13 year old male, A.V., on an overnight trip. This trip took the three plus Causey's adult son, McClain Causey, to Shreveport, Louisiana from Jackson,

Mississippi in order to attend the Independence Bowl. (Record Document 236-1 at 1-4). Causey's son was 26 or 27 at the time. (See Id; Trial Transcript Vol. II at 385). At the conclusion of the evening, Hitt, Causey and A.V. shared a hotel room while Causey's son occupied a hotel room by himself. A.V. testified at the trial that at some point during the night he was awakened by Causey and Hitt. Causey held down A.V. while Hitt had anal intercourse with him. Subsequently, Hitt held down A.V. so Causey could do the same. (Record Document 636-1 at 4). A.V. claimed this kind of assault continued through the fall of 2003. (Record Document 636-1 at 5).

After being raped by Causey and Hitt in October of 2003, A.V. began to experience stomach and rectal pain. (Record Document 636-1 at 6). A.V. was brought to the emergency room and was examined by Dr. Eric Zoog. This examination was brief, consisting of a two-three minute examination of A.V.'s rectum. Dr. Zoog claimed he saw no fissures, or tears, in A.V.'s rectum. See Id.

The next day, A.V. told his teacher about the abuse from Causey and Hitt and was taken to see Dr. Danurius Williams. This examination was cut short as A.V. was to be examined by another doctor. (Record Document 636-1 at 7). Dr. Williams only had time to look for major issues with A.V.'s rectum and found none. See Id. One day after seeing Dr. Williams, A.V. was examined by Dr. Ronald Persing, an expert in forensic examinations regarding child sexual abuse, for more than two hours. He determined that there were signs of sexual abuse. Causey was later indicted on "three counts of transporting a person across state lines for the purpose of engaging in illegal sexual activity." (Record Document 231-1 at 5).

## TRIAL PROCEEDINGS

### Government's Case

Causey was tried jointly with Hitt before a jury in the Western District of Louisiana. The trial took place from April 12, 2005 to April 22, 2005. The jury returned a verdict of guilty against Causey and Hitt on all three counts of the indictment. (Record Document 231-1 at 5). The jury heard testimony from twenty-two witnesses, including five expert witnesses. Of those twenty-two witnesses, the Defense presented two experts in ER medicine, an expert in child and adolescent psychiatry and a fourth expert in the fields of forensic psychiatry and child and adolescent psychiatry. Causey testified in his own defense. The victim, A.V., also took the stand. Co-defendant Hitt did not testify. (Trial Transcript Vol I-VI).

At trial, the Government first called A.V. himself. At the time of his testimony, A.V. was 16 years old. (Sealed Testimony of A.V. at 32). A.V. began by recounting his mother's attempted suicide, his poor relationship with his father and his time living with Jimmy and Charlene Rushing after his mother attempted suicide. (Sealed Testimony of A.V. at 33-37). Charlene Rushing knew A.V. because A.V. was her brother's wife's sister's child. (Trial Transcript III at 603). He described how he was introduced to Hitt and Causey, a physician, through the Rushings. (Sealed Testimony of A.V. at 38, 41). A.V. discussed how Hitt and Causey would buy him things and take him ice skating, out to eat and to the movies. (Sealed Testimony of A.V. at 43-44). A.V. testified that the first

episode of inappropriate touching took place when Hitt touched his rear while he was climbing out of Hitt's attic. (Sealed Testimony of A.V. at 46).

A.V. began describing the events that took place on their trip to Shreveport, Louisiana for the Independence Bowl. He described how he was with Hitt, Causey and Causey's son, McClain. (Sealed Testimony of A.V. at 57). A.V. was under the impression that the sleeping arrangements during this trip would be that he and McClain would sleep in one room, while Hitt and Causey would be in the other. He was told that this would be the case by Jimmy Rushing, Hitt and Causey. (Sealed Testimony of A.V. at 57). However, when A.V. was walking towards McClain to go to their room, Causey told A.V. he would be staying in their room instead. (Sealed Testimony of A.V. at 66). When A.V. got into the room, they watched television and A.V. was in a bed by himself. (Sealed Testimony of A.V. at 68). A.V. was awakened by Causey and Hitt "messing with" him. (Sealed Testimony of A.V. at 69). They were pulling his shorts down and A.V. told them to stop. (Sealed Testimony of A.V. at 69-70). A.V. described himself as "terrified" while this was going on. (Sealed Testimony of A.V. at 70). A.V. then watched as they "put lubrication on their penis." See Id. Then Hitt climbed on A.V.'s bed and had Causey hold him down while Hitt had anal intercourse with A.V. (Sealed Testimony of A.V. at 71). After Hitt finished, Causey then "did the same thing." (Sealed Testimony of A.V. at 72). Upon finishing, Hitt and Causey took a shower and then instructed A.V. to take a shower as well. (Sealed Testimony of A.V. at 74). Causey and Hitt then instructed A.V. not to tell anyone. See Id. A.V. stated that he thought about telling someone but he didn't know who he could tell that he trusted. (Sealed Testimony of

A.V. at 78). Upon returning from Shreveport, Jimmy Rushing asked A.V. if Causey or Hitt "messed with" him. (Sealed Testimony of A.V. at 91). A.V. responded that they had not. The reason he gave this response was because he feared Causey and Hitt would make him look like a liar and he felt that since "they had been friends longer than [A.V.] had been alive," Jimmy would not believe him. <u>See Id</u>.

After the trip to Shreveport, Causey and Hitt continued to give A.V. gifts and take him out to dinner and the movies. (Sealed Testimony of A.V. at 93). During the following summer, A.V. would spend time with Hitt and Causey while the Rushings were at work because they did not approve of him going anywhere else. (Sealed Testimony of A.V. at 97). A.V. testified that sexual encounters did take place that summer at Hitt's and Causey's house. (Sealed Testimony of A.V. at 101). When A.V. was at Hitt's house, Causey was not involved in the anal intercourse but when A.V. was at Causey's house, both were involved. (Sealed Testimony of A.V. at 101). A.V. stated that at times Causey and Hitt would administer some type of drug that would knock A.V. out. (Sealed Testimony of A.V. at 102-103). A.V. also mentioned an individual named "David" would go to dinner with them sometimes. (Sealed Testimony of A.V. at 107).

A.V. then stated that last time he had a sexual encounter with Causey and Hitt was October of 2003. (Sealed Testimony of A.V. at 108). After this encounter, A.V. began to feel pain in his rectal area. <u>See Id</u>. A.V. reported these pains to Jimmy Rushing who took him to the hospital. (Sealed Testimony of A.V. at 110). A.V. then recounted what occurred at the doctors office and how he told his teacher, "Ms. Varner," about the encounters he had with Causey and Hitt. (Sealed Testimony of A.V. at 113).

A.V. also described an argument he had with Charlene Rushing that led to A.V. being arrested. (Sealed Testimony of A.V. at 121). A.V.'s direct examination ended with him identifying both Causey and Hitt in open court. (Sealed Testimony of A.V. at 125).

Cross-examination of A.V. by defense counsel consisted of questions about why he waited so long to report the abuse, attempts to discredit A.V.'s account of the abuse, and attempts to show the discrepancies in the number of times he claimed the abuse took place. (Sealed Testimony of A.V. at 125-190).

Mary Elizabeth Taylor ("Taylor"), the Mississippi state appointed guardian ad litem of A.V., testified next. Taylor explained the court appointment process and described her work for Mississippi Court Advocacy and Justice, a private, nonprofit agency. (Trial Transcript Vol. I at 204, 211). Her testimony included her involvement with A.V.'s Mississippi state court civil suit against Causey for sexual molestation. (Trial Transcript Vol. I at 204-210).

Barbara Varner ("Varner") was the next witness called. Varner was A.V.'s teacher in 2003. (Trial Transcript Vol. II at 235). She testified that A.V. displayed no "major behavior problems" and was never disrespectful. (Trial Transcript Vol. II at 234). Varner further testified that on October 30, 2003, A.V. asked to speak to her privately. He told her that "two of his foster parents' friends had molested him" and A.V. actually stated they "had sex with him." (Trial Transcript Vol. II at 236). Varner testified that A.V. was "shaking all over," "extremely upset," and "very pale" when he told her this. (Trial Transcript Vol. II at 236-237). A.V. told Varner about the trip to Shreveport and that "his foster parents' friends" had sex with him "in the room." (Trial Transcript Vol. II at 237).

After Varner, the Government called Dr. Eric Zoog as a fact witness, albeit an examining physician. On cross-examination, Dr. Zoog was tendered as an expert in ER medicine by the defense. Dr. Zoog testified regarding A.V.'s emergency room visit. Dr. Zoog testified that the examination lasted only fifteen minutes and only two or three minutes of that exam focused on A.V.'s rectum. (Trial Transcript Vol. II at 250, 252). Dr. Zoog also stated that this was not a forensic exam. (Trial Transcript Vol. II at 250-251). During his examination, Dr. Zoog did not notice any tearing or scarring around A.V.'s outer rectal area. (Trial Transcript Vol. II at 254). Dr. Zoog testified that while he did not see any fissures, or rectal tears, one may be present but not visible to the naked eye. (Trial Transcript Vol. II at 255). Finally, Dr. Zoog admitted he had an obligation under Mississippi law to report any signs of sexual abuse, and that he did not report any abuse because he saw no signs of it. (Trial Transcript Vol. II at 272).

Dr. Danurius Williams was the Government's fifth witness. His testimony also centered on a brief ER visit with A.V. He first admitted he did not preform a forensic exam on A.V. (Trial Transcript Vol. II at 278). Dr. Williams' exam was cut short when a Mississippi state court judge directed him to end his exam. (Trial Transcript Vol. II at 279). Dr. Williams sought permission from the judge to determine if there were any major medical reasons why A.V.'s exam could not wait until the next day. (Trial Transcript Vol. II at 280). During this abbreviated exam, Dr. Williams noticed swelling in A.V.'s lymph nodes located in the "frontal groin area." (Trial Transcript Vol. II at 281). Dr. Williams stated that he saw no tears in A.V.'s rectum. (Trial Transcript Vol. II at 282). The Government showed Dr. Williams three pictures of A.V.'s rectal area taken in an

examination by Dr. Persing. (Exhibits G-1, G-2 and G-3) (Trial Transcript Vol. II at 284). Dr. Williams was asked "Do you see any fissures in those photographs?" and he responded, "Yes, sir." (Trial Transcript Vol. II at 287). Dr. Williams further acknowledged that there could have been fissures present during his exam and he missed them. (Trial Transcript Vol. II at 2287-288). On cross-examination, Dr. Williams, in reference to the swollen lymph nodes, admitted that these could simply be caused by a "nick on your leg." (Trial Transcript Vol. II at 292-293).

The third physician the Government called was Dr. Ronald Persing. Dr. Persing was called to discuss his findings through various meetings with and examinations of A.V. and was accepted by the Court as an expert in "forensic examinations regarding child sexual abuse." (Trial Transcript Vol. II at 302). Dr. Persing, as an expert in forensic examinations regarding child sexual abuse, conducted an examination of A.V. in order to determine if there was evidence of sexual abuse. The result of this and follow-up examinations was that A.V.'s physical condition was consistent with anal sexual penetration occurring around late October of 2003. (Record Document 236-1 at 9). Specifically, Dr. Persing stated A.V. had multiple rectal fissures, prostatitis, an inflammation in the prostate, and inguinal adenitis, a condition involving an enlargement in lymph nodes "where the groin, or where the leg joins the hips". (Trial Transcript Vol. II at 321-324).

After the three physicians took the stand, the Government called Causey's adult son, McClain Causey. The purpose of his testimony was to shed further light on the trip that he, A.V., Hitt and his father William A. Causey made to Shreveport. He testified that

when they arrived at the hotel in Shreveport to turn in for the night, all four went into his room and then A.V., Hitt, and Causey left to go into a separate room. (Trial Transcript Vol. II at 384). He then admitted that he told an FBI agent that he felt the sleeping arrangement on the night of the sexual abuse was "strange." (Trial Transcript Vol. II at 396).[1]

Lieutenant David Gammill, one of the arresting officers, was also called as a Government witness. (Trial Transcript Vol. II at 400). Lt. Gammill explained how he had read Hitt his rights and ensured that Hitt understood them. While transporting Hitt to the police department, Hitt was again reminded of his rights and then asked if he remembered having sex with any juvenile males. Hitt responded "Yes." When asked what this male's name was, he responded with A.V.'s name. (Trial Transcript Vol. II at 405-407). Later, Lt. Gammill asked him more directly if he had anal sex with A.V. to which Hitt responded in the affirmative, and that it had occurred twice. (Trial Transcript Vol. II at 410-411). At no point did the jury hear any testimony about Hitt's confession having implicated Causey.[2]

Al Nelson, a hotel front desk clerk, took the stand for the Government. (Trial Transcript Vol. III at 430). Nelson testified that Causey purchased two hotel rooms on

---

[1]The FBI agent, Allen Currie, took the stand and confirmed that Causey's son had told him this.

[2]While Hitt's confession did in fact implicate Causey, defense counsel successfully made a timely <u>Bruton</u> challenge to the portion of the testimony implicating Causey. In accordance with <u>Bruton</u>, the Court instructed Lt. Gammill to make no mention of how Hitt's confession actually implicated Causey as a participant in the sexual abuse of A.V. in Shreveport, Louisiana.

the December 27th, 2002 and that there were other rooms available for the evening. (Trial Transcript Vol. III at 437).

The Government then called David Moore, a nineteen year old male. (Trial Transcript Vol. III at 445). Moore met Causey and Hitt through his probation officer. (Trial Transcript Vol. III at 446). Moore testified to going to dinners with Causey and Hitt and that A.V. was present at some of them. (Trial Transcript Vol. III at 449). Moore described one afternoon when he went to have lunch with Hitt. Hitt then took him to Causey's place of work and then back to Causey's home where they viewed a "gay website". (Trial Transcript Vol. III at 452, 455). Subsequently, Causey arrived home and, at some point, Hitt gave Moore a "bear hug." (Trial Transcript Vol. III at 462). Then "they" began unbuttoning Moore's shirt, feeling his rear, and kissing him. (Trial Transcript Vol. III at 463-464). Moore testified that the next thing he knew, he was upstairs in Causey's home, dressed only in his boxers and they brought him straight to the bed. (Trial Transcript Vol. III at 465). Hitt then removed Moore's boxers and then Causey and Hitt undressed. (Trial Transcript Vol. III at 446). Causey then began to suck on Moore's tongue. (Trial Transcript Vol. III at 467). Hitt then performed oral sex on Moore while Causey restrained Moore's upper body. (Trial Transcript Vol. III at 468). Hitt then commenced to have anal intercourse with Moore while Causey masturbated. (Trial Transcript Vol. III at 469). Hitt eventually ejaculated on Moore's stomach. (Trial Transcript Vol. III at 470). This encounter then repeated itself with Hitt again molesting Moore while Causey masturbated. (Trial Transcript Vol. III at 470). Moore was 17 during this encounter. (Trial Transcript Vol. III at 453).

Moore testified that he was watching the news when he saw Causey and Hitt's picture on television. (Trial Transcript Vol. III at 477). When he saw they were accused of homosexual rape, he informed his mother and grandmother and eventually spoke with the police about his encounter with Causey and Hitt. (Trial Transcript Vol. III at 479). Throughout Moore's cross-examination, defense counsel attempted to make the events look consensual. (Trial Transcript Vol. III at 482-513).

The Government's final witness was Dr. George Seiden. Dr. Seiden was accepted by the Court as an expert in forensic psychiatry. (Trial Transcript Vol. III at 527). Dr. Seiden began by admitting he did not examine the defendants or victims. (Trial Transcript Vol. III at 528). Next Dr. Seiden was asked if he was "here to tell the jury who is telling the truth and who is lying." Dr. Seiden responded, "No, sir. I'm not qualified to do that." See Id. Dr. Seiden stated that his purpose was to "dispel some myths" regarding sexual abuse. See Id. The information that Dr. Seiden provided to the jury was based upon published psychiatric studies, not his personal interactions with Causey, Hitt, A.V., or Moore. (Trial Transcript Vol. III at 531).

Dr. Seiden explained how child molesters will often pick vulnerable victims. (Trial Transcript Vol. III at 532). A vulnerable victim includes a child from a disrupted home, perhaps in foster care. See Id. Child molesters, he explained, will often times "groom" their victims. See Id. "Grooming a victim" involves gaining the victim's trust and engaging in behaviors so the victim would become more receptive to sexual advances. (Trial Transcript Vol. III at 533). Dr. Seiden also explained how child sexual abuse victims will often delay reporting because of "shame or guilt." (Trial Transcript Vol. III at

535). Further, reports of abuse from adolescent males are often inconsistent. (Trial Transcript Vol. III at 537). Dr. Seiden also explained how adolescent males "will often return to the person who has abused them." (Trial Transcript Vol. III at 538). On cross-examination, Dr. Seiden stated that false reports are rare. In fact, he stated that when there is a custody dispute false reporting of sexual abuse can be around twenty percent; however, without a custody dispute pending, false reporting would be closer to two to eight percent. (Trial Transcript Vol. III at 547-548). At no point did Dr. Seiden testify as to specifics involving A.V., Causey, Hitt or Moore; he only spoke in terms of studies he has reviewed as an expert in his field.

### Defense Case

The defendants' trial team consisted of four attorneys, two primary counsel and one local lawyer for Causey and one Federal Public Defender from Shreveport for Hitt. Counsel for Hitt first called Dr. Stephen Billick. The Court accepted Dr. Billick as an expert in child and adolescent psychiatry and forensic psychiatry. (Trial Transcript Vol. III at 566). Just as Dr. Seiden, Dr. Billick admitted he had not evaluated Causey, Hitt, A.V. or Moore. (Trial Transcript Vol. III at 566). Dr. Billick opined that 98% of male sex abusers are heterosexual. (Trial Transcript Vol. III at 568). He also stated that grooming would not be necessary in case of forced rape as there would be no reason for building up a relationship with the victim. (Trial Transcript Vol. III at 569). As to returning to the abuser, Dr. Billick stated that, in his opinion, rape victims "do not return to be raped again." (Trial Transcript Vol. III at 572). On cross-examination, Dr. Billick stated "in the more than 25 years that I have been working with sexually abused adolescents, I have

never seen a case where the adolescent willingly returned to the abuser where the adolescent did not like the abuse," thus limiting his opinion to his psychiatric practice. (Trial Transcript Vol. III at 580). Dr. Billick also addressed false allegations of abuse. In doing so, Dr. Billick stated that false reports are more common when the alleged victim is psychotic or delusional. (Trial Transcript Vol. III at 572). As to the truthfulness of an accused, Dr. Billick testified that there is "no litmus test to truth telling." (Trial Transcript Vol. III at 586).

Counsel for Causey then called Dr. J. Scott Stanley. Dr. Stanley was accepted as an expert in forensic psychiatry and child adolescent psychiatry. Dr. Stanley began by explaining how, in recounting events, he would expect small inconsistencies but not major inconsistencies from the victim. (Trial Transcript Vol. III at 592). He also testified on cross-examination that, theoretically, it makes sense that a young male would fear reporting sexual abuse because of the stigma of homosexuality. (Trial Transcript Vol. III at 600).

After these two experts, counsel for Causey called Zena Charlene Rushing ("Charlene"). A.V. lived with Charlene and her husband Jimmy beginning around October of 2002 pursuant to a custody order. (Trial Transcript Vol. III at 604). Charlene explained how she had problems with A.V. In fact, she mentioned how A.V. would lie "most every day" and not do what she and her husband asked him to do. (Trial Transcript Vol. III at 608, 613). She also admitted that she would not believe A.V. under oath. (Trial Transcript Vol. III at 617). In the Spring of 2003, Charlene explained how A.V. would get in her face, yell at her, threaten to hit her, and throw things at her. (Trial

13

Transcript Vol. III at 610). On one occasion, she even called the police when the "arguing and fussing" escalated. A.V. had to spend two weeks in "youth court." (Trial Transcript Vol. III at 614). As a result of this detention, A.V. was not allowed to see one of his friends, Shelby Dickerson. Charlene testified that A.V.'s response was "if he couldn't be friends with Shelby Dickerson, that he could make my life a living hell, that me and Scott Hitt would not be friends anymore. That he could make it happen." (Trial Transcript Vol. III at 615).

Charlene told the jury how A.V. came home one day very excited about the opportunity to go to the Independence Bowl with Causey, Hitt and McClain. (Trial Transcript Vol. III at 607). She mentioned that when she spoke to A.V. while he was on that trip, "he was a happy little boy." (Trial Transcript Vol. III at 609).

In A.V.'s last telephone conversation with Charlene, he told her that he made a big mistake but would not explain what he was talking about. (Trial Transcript Vol. III at 616). This conversation took place after he had accused Causey and Hitt. See Id.

At the conclusion of Charlene Rushing's cross-examination, she was asked if she believed that A.V. fabricated this story. Her response was, "To be honest, I really don't know anymore." (Trial Transcript Vol. III at 632).

The next witness was Charlene's husband, Jimmy Rushing ("Jimmy"). Jimmy confirmed much of Charlene's testimony. For example, Jimmy mentioned that A.V. was "not telling the truth a lot." (Trial Transcript Vol. III at 640). He also confirmed that A.V. was excited to go the Independence Bowl and he was happy and cheerful when

returned he home. (Trial Transcript Vol. III at 644). Jimmy also stated he would not trust A.V., even if he was under oath. (Trial Transcript Vol. III at 645).

During the defendant's case in chief, Dr. Zoog, previously tendered as an expert in ER medicine by defense counsel, was recalled and given Government's Exhibit 3, the picture Dr. Persing took of A.V.'s rectum. (Trial Transcript Vol. IV at 687). He was also shown Government Exhibit 3-a, the same picture that Dr. Persing had marked with arrows pointing out what he identified as anal fissures. (Trial Transcript Vol. IV at 688). Dr. Zoog responded that what he saw in the pictures were only skin folds. (Trial Transcript Vol. IV at 689). He stated that he could not rule out the presence of anal fissures but that he could not see any in the picture. (Trial Transcript Vol. IV at 691). He further testified that a bowel movement can cause more than a single anal fissure, which directly contradicted Dr. Persing's testimony. (Trial Transcript Vol. IV at 689).

Next, defense counsel called Mary Angela Havard, who worked with Causey for thirteen years. (Trial Transcript Vol. IV at 705). Her purpose was to show that Causey rarely left the office for lunch and when he did, he did consults at a hospital. (Trial Transcript Vol. IV at 704). She was also called to testify regarding Causey's character. (Trial Transcript Vol. IV at 712).

Causey then took the stand in his own defense. He recounted his side of the story A.V. told regarding the Independence Bowl, stating that it was A.V.'s request to stay in the same hotel room as Hitt and Causey. (Trial Transcript Vol. IV at 732-753). He stated he had done research looking for the drug that A.V. spoke of and that he could find none. (Trial Transcript Vol. IV at 760). He admitted to examining David Moore

in his clinic but contradicted the rest of Moore's accounts of that day. (Trial Transcript Vol. IV at 763-771). On cross-examination, testimony was elicited that while Hitt was incarcerated (due to a bond violation), Causey warned Hitt not to say anything to anyone about the subject matter of the case because there were "plants in the prison." (Trial Transcript Vol. IV at 793-794).

Dr. Stephen Hindman testified next for the defense, also as a character witness on Causey's behalf. (Trial Transcript Vol. IV at 818).

The final defense witness called to the stand was Anna Morris who testified that Hitt worked 39 hour work weeks, ran a catering business and attended night class. (Trial Transcript Vol. IV at 822-823).

Government's Rebuttal

The Government called one rebuttal witness, Special Agent James Podboy ("Podboy") of the Department of Homeland Security. Podboy was the lead case agent for the Government. (Trial Transcript Vol. V at 891). Podboy stated that the Rushings conveyed to him that Causey had told the Rushings what the planned sleeping arrangements were going to be in Shreveport with McClain Causey sharing a room with A.V. (Trial Transcript Vol. V at 894). He also stated that the Rushings, throughout a several hour interview, never mentioned A.V. threatening to take Hitt away from her. See Id.

Jury Verdict and Restitution

On April 22, 2005, the jury found Causey and Hitt guilty on all "three counts of transporting a person across state lines for the purpose of engaging in illegal sexual

activity." (Record Document 231-1 at 5). Causey and Hitt were each sentenced to a total term of imprisonment of 300 months and both were ordered to pay restitution in the amount of $219,206 based on a Report and Recommendation of the U.S. Magistrate Judge adopted by the Court. (Record Document 192).

## APPELLATE REVIEW

Hitt and Causey both appealed their convictions. The U.S. Fifth Circuit Court of Appeals reviewed this case and affirmed both convictions and sentences. (Record Document 208); U.S. v. Hitt, 473 F.3d 146 (5th Cir. 2006).

The issues raised by both Causey and Hitt on direct appeal were described by the Fifth Circuit as:

> "(1) that the evidence was insufficient to convict Hitt and Causey of the Mann Act violations; (2) that the district court committed reversible error when it charged the jury with a superceded Allen charge; (3) that the district court violated the defendants' right to a public trial by closing the courtroom for the hearing of a pre-trial motion and for AV's testimony at trial; and (4) that the district court's limitation of cross-examination of AV violated the Confrontation Clause."

U.S. v. Hitt, 473 F.3d at 151.

Causey additionally argued that:

> "(1) that the district court violated the Confrontation Clause by allowing the use of Hitt's confession, which did not mention Causey, in cross-examination of Causey and other witnesses; (2) that the district court committed reversible error by prohibiting Causey from questioning one of Hitt's witnesses on re-direct when Causey did not undertake a direct examination of the witness; and (3) that unobjected-to remarks in the government's closing statement were plain error that required reversal of the jury's verdict."

U.S. v. Hitt, 473 F.3d 146, 151-152 (5th Cir. 2006).

As to the four issues brought jointly, the Fifth Circuit held: (1) the evidence was sufficient for a conviction; (2) the Allen charge given, though modified, was properly within the District Court's discretion; (3) the defendants waived their Sixth Amendment arguments by not objecting to the closing of the courtroom; (4) the Court, by not allowing defendants to cross-examine A.V. on prior sexual abuse, did not commit error as the "prior sexual acts is only marginally relevant, and that introduction of such evidence would be prejudicial and cause jury confusion." U.S. v. Hitt, 473 F.3d 146, 152-157 (5th Cir. 2006).

As to the three issues Causey brought individually, the Fifth Circuit held: (1) use of Hitt's confession did not violate any of Causey's rights as at no point did it include any reference to Causey; (2) not being able to redirect Dr. Zoog when recalled by Hitt did not violate the Sixth Amendment as he was not called as a witness against Causey; (3) the Government's closing statement may have been improper, but only in one occurrence in one portion of the argument. Therefore, it did not require reversal. U.S. v. Hitt, 473 F.3d 146, 159-162 (5th Cir. 2006).

The United States Supreme Court denied certiorari. Causey v. United States, 06-1419 (2007).


## CAUSEY'S MOTION TO VACATE SENTENCE

Causey has filed with this Court a Motion to Vacate Sentence pursuant to 28 U.S.C. § 2255. He has listed three grounds for this motion: (1) ineffective counsel; (2)

the unconstitutional failure of the prosecution to disclose evidence favorable to the defense under Brady; and (3) the unconstitutional restriction on his right to present a defense. (Record Document 265-1). Causey then "renewed" his motion and, alternatively, requested an evidentiary hearing.[3] (Record Document 265).

## I. Ineffective Trial Counsel

Causey has asserted that his trial counsel were ineffective to the point of violating his Sixth Amendment right to counsel. "The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution' to which they are entitled." Strickland v. Washington, 466 U.S. 668, 685 (1984). The Supreme court has recognized "the right to counsel is the right to the effective assistance of counsel." McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970).

"The Sixth Amendment refers simply to 'counsel,' not specifying particular requirements of effective assistance. It relies instead on the legal profession's maintenance of standards sufficient to justify the law's presumption that counsel will fulfill the role in the adversary process that the Amendment envisions." Strickland v. Washington, 466 U.S. at 685.

Strickland provided courts with a two components in determining if ineffective counsel violated a defendant's right to counsel:

---

[3]The Court notes that this renewed motion was drafted by two new attorneys from the same law firms as the initial §2255 motion. The renewed §2255 motion made no new arguments except for requesting an evidentiary hearing.

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

See Id at 687.

In explaining the first component, the Supreme Court stated, "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an *objective standard of reasonableness*." Our emphasis, See Id at 687-688. "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." See Id at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." See Id. Further, "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must

overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " <u>See Id</u>.

Regarding prejudice, the Supreme Court has held that even if counsel is deemed constitutionally ineffective, the defendant must still have endured some type of prejudice as a result. <u>Strickland v. Washington</u>, 466 U.S. at 692. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>See Id</u> at 694. While in certain cases, prejudice is presumed, that issue has not been raised in the case at bar. Therefore, it is the duty of this Court to determine both if Causey's trial counsel's performance was objectively unreasonable and whether that prejudiced Causey.

Causey's counsel raises seven claimed instances of ineffective counsel. The Court will address each claim separately.

<u>Failure to Consult an Expert in Sexual Abuse</u>

Causey asserts that his trial counsel were "objectively unreasonable" in not consulting with an independent sexual abuse expert to challenge the medical evidence of sexual abuse offered by the Government. (Record Document 231-1 at 19). Causey points specifically to the testimony of Dr. Persing, the Government's expert in forensic examination regarding child sexual abuse. (Record Document 231-1 at 20-23). Causey asserts that had his trial counsel consulted with an independent expert, it would have changed the outcome of the trial. In support of this claim, Causey's current attorneys retained a "sexual abuse expert," Dr. Daniel Lindberg. (Record Document 231-1 at 23).

Dr. Lindberg, in his declaration to the Court, contradicted Dr. Persing's findings of anal fissures and prostatitis.

*Relevant Facts*

Causey states that his trial counsel were ineffective for not calling a witness such as Dr. Lindberg. Dr. Lindberg, in his declaration to the Court, stated that the pictures that Dr. Persing testified through, G-1, G-2, G-3 and G-3a, neither "confirms nor excludes the possibility that he had been engaged in anal intercourse." (Record Document 231-2 at 4). The Court views this opinion as equivocal at best. His opinion is that Dr. Persing "was wrong when he concluded A.V. had 13 anal fissures" and that at least "11 of the 13 anal features labeled as fissured are clearly simple skin folds." (Record Document 231-2 at 3). Had Dr. Lindberg been asked to testify, he would have told the jury that what he saw was consistent with constipation. See Id. The Court notes that "consistent with constipation" is not the same as more probable than not due to constipation. He also stated that it is "unlikely that my opinion as to the existence of fissures or evidence of anal intercourse would be different if I had examined A.V. myself." See Id. This opinion is no more than inadmissible speculation. Dr. Lindberg also addressed Dr. Persing's diagnosis of prostatitis. It is Dr. Lindberg's hindsight opinion that Dr. Persing's exam of A.V. was too limited to make this diagnosis. (Record Document 231-2 at 4). Finally, in regards to Dr. Persing's diagnosis of inguinal adenitis, Dr. Lindberg states that without the findings of thirteen anal fissures or prostatitis, this diagnosis alone does not prove A.V. was engaged in any anal intercourse. (Record Document 231-2 at 4).

At the trial in question, Dr. Ronald Persing was the sixth witness called by the Government. The Court accepted Dr. Persing as an expert in forensic examinations regarding sexual abuse. Dr. Persing testified that he examined A.V. multiple times. During A.V.'s initial visit, Dr. Persing noticed that A.V.'s rectum was a "deeper red color" as opposed to the normal "light pink color." (Trial Transcript Vol. II at 317). Through Government's Exhibits 3 and 3a, Dr. Persing demonstrated how he viewed multiple fissures, or rectal tears, going around the entire rectum. (Trial Transcript Vol. II at 319). Dr. Persing stated he felt the injuries he discovered were compatible with anal sexual penetration occurring around late October of 2003. (Trial Transcript Vol. II at 321).

Dr. Persing also noted that A.V.'s prostate was tender, which led to his diagnosis of prostatitis. Dr. Persing stated that this, too, was compatible with anal sexual penetration and that a tender prostate was "quite uncommon" for a 13 year old boy. (Trial Transcript Vol. II at 322-23). Finally, Dr. Persing noted A.V. suffered from inguinal adenitis, an enlargement of the lymph nodes "where the groin, or where the leg joins the hips". See Id. He noted a connection between the fissures and the prostate and the lymph nodes. (Trial Transcript Vol. II at 324). Eventually, through subsequent examinations, Dr. Persing noted that the symptoms eventually healed. (Trial Transcript Vol. II at 327). Dr. Persing also stated he found anal leakage in A.V. in April of 2004. He testified that leakage is consistent with chronic sexual abuse. (Trial Transcript Vol. II at 373).

During cross-examination, Dr. Persing admitted he did not have either Dr. Zoog's or Dr. Williams' reports while examining A.V. (Trial Transcript Vol. II at 337). Defense

counsel questioned Dr. Persing as to whether the bleeding and pain could have been caused by a bowel movement. Dr. Persing admitted A.V.'s anal bleeding and pain presented themselves during bowel movements. (Trial Transcript Vol. II at 340). Further, he admitted anal fissures could be caused by "constipation or passing large, hard stools." (Trial Transcript Vol. II at 341). Dr. Persing also admitted that an anal fissure would heal within 7 days and if one were created a year prior, it would be unexpected for it not to have healed. (Trial Transcript Vol. II at 342). Dr. Persing then admitted that in February or March of 2004, roughly four months after the last accusation of anal intercourse with Causey and Hitt, A.V. again found blood on his toilet paper caused by bowel movements. (Trial Transcript Vol. II at 357).

Dr. Persing was also cross-examined on the issue of fissure patterns. He admitted that he has no medical knowledge or research that ties certain fissure patterns to anal sexual abuse. (Trial Transcript Vol. II at 351). He stated that the only medical knowledge he has on fissure patterns is that constipation only causes a single fissure and A.V. had multiple fissures. See Id.

Defense counsel also questioned Dr. Persing on the pictures introduced by the Government in relation to A.V.'s rectal fissures. As opposed to G-3 and G-3a, Dr. Persing was shown G-1 which was also of A.V.'s rectum. Dr. Persing admitted that there were zero fissures visible in G-1. (Trial Transcript Vol. II at 354). Dr. Persing stated that fissures "tend to be hidden in the crypts." (Trial Transcripts Vol. II at 355). He further stated that the picture does not show how red A.V.'s rectum was at the time of the exam. See Id.

In regards to A.V.'s tender prostate, diagnosed as prostatitis, Dr. Persing admitted that the tenderness was related to the fissures, which could have been caused by constipation rather than sexual abuse. Again, Dr. Persing admitted that A.V. had been complaining about painful bowel movements. (Trial Transcript Vol. II at 343). In regards to examining A.V.'s prostate, Dr. Persing stated he could not feel over the surface of the entire prostate due to the pain it caused A.V. (Trial Transcript Vol. II at 345). Finally, in terms of A.V.'s prostate, Dr. Persing admitted he only noted in his records tenderness, and not inflammation in A.V.'s prostate. In order to properly diagnosis prostatis, he admitted, a doctor must find inflammation, which is a finding he did not make. (Trial Transcript Vol. II at 345-349).

Defense counsel also cross-examined Dr. Persing on his diagnosis of inguinal adenitis. Dr. Persing admitted to defense counsel that swollen lymph nodes can be caused by infection anywhere on the top of your leg or even an ingrown toenail. (Trial Transcript Vol. II at 359).

Defense counsel recalled Dr. Zoog in their case-in-chief. Dr. Zoog, when viewing G-3 and G-3a as an expert in ER medicine, stated that he saw only skin folds and no rectal, or anal, fissures. (Trial Transcript Vol. IV at 689). He further testified that, in his opinion, a bowel movement can cause more than a single anal fissure, which directly contradicted Dr. Persing's opinion testimony. (Trial Transcript Vol. IV at 689).

*Causey's Counsel Were Not Ineffective*

<u>Strickland</u> requires that in order for Causey to prevail on this point, his trial counsel's performance must fall below "an objective standard of reasonableness."

Strickland v. Washington, 466 U.S. at 688. Causey cites case law discussing the ineffectiveness of counsel when counsel did not consult with an expert in a sex abuse case. (Record Document 231-1 at 25-27).

Causey contends that Eze v. Senkowski, is "particularly instructive." 321 F.3d 110 (2nd Cir. 2003); (Record Document 231-1 at 26). In Eze, a sexual abuse case, the prosecution's only physical evidence of sexual abuse was the testimony of an expert. Eze v. Senkowski, 321 F.3d 110, 115 (2d Cir. 2003). This physician took the stand and stated that sexual abuse had occurred because the female victim's hymens were "abnormal and attenuated." See Id. One of the issues in Eze pertained to evidence that one of the victim's hymen was diagnosed as abnormal prior to the alleged abuse. See Id. at 126. Counsel for the defendant never brought this evidence to the jury. See Id. at 126-127. Further, it was never brought to the jury's attention that the medical field had begun to cast much doubt on the correlation between a female's hymen and sexual abuse. See Id. at 127. For these reasons, the Court in Eze held defense counsel was constitutionally ineffective and vacated the defendant's sentence. See Id. at 138. Eze relies on a similar case, Lindstadt v. Keane, where trial counsel was ineffective when it failed to educate itself on the "vagaries of abuse indicia." 239 F.3d 191 (2d Cir. 2001).

Causey argues that like Eze, his trial counsel did not consult or present an independent expert in sexual abuse to contradict Dr. Persing's testimony. While Dr. Zoog and Dr. Williams both took the stand, Causey states that since neither had any specialized training in sexual abuse their testimony cannot be held sufficient to show effective counsel. The Government responds to this argument by distinguishing Eze and

<u>Lindstadt</u> and stating that Causey's counsel, throughout the trial, made all the points Dr. Lindberg would have made. The Court concurs with the Government's assessment. Expert testimony adduced by the Defense at trial addressed the same issues as Dr. Lindberg's declaration.

This Court is not persuaded that Dr. Lindberg's declaration shows the Causey's trial counsel were ineffective. The first consideration for the Court is whether Causey's trial counsel's performance was "objectively unreasonable" in not at least consulting with an expert physician trained in sexual abuse. At the outset, it is apparent to the Court from the record that Causey's trial counsel consulted with someone who knew about anal fissures, prostatitis, and inguinal adenitis. The Court accepts Causey's trial counsel's declarations that they did not consult with an expert with the same qualifications as Dr. Persing. However, the record clearly shows that either Causey's trial counsel consulted with someone with some expertise in these areas, or else were previously educated on the medical issues by the medical experts presented by the Defense at trial. Causey's trial counsel amply demonstrated on cross-examination of Dr. Persing and the direct examination of other expert medical witnesses that they were well versed in all of the issues contained in Dr. Lindberg's post-trial declarations to the Court.

Had Causey's trial counsel called Dr. Lindberg or someone similar to testify, the main points this expert would have made were that the anal fissures were merely skin folds and the diagnosis of prostatitis was unfounded. This would only leave Dr. Persing's diagnosis of inguinal adenitis, which, standing alone, is not evidence of sexual

abuse. Unlike <u>Eze</u>, where defense counsel failed to get any testimony on the record regarding a victim's prior examination or any testimony about how a particular medical methodology was being challenged, all of the points Dr. Lindberg would have raised were in fact thoroughly covered at trial. Regarding the anal fissures, Dr. Zoog, an expert in ER medicine, testified that when he viewed G-3 and G-3a, all he saw were skin folds. Further, he testified that he believed that constipation could cause more than one anal fissure. Dr. Persing himself admitted that A.V. complained of bleeding and pain in his rectum when we was making bowel movements and that constipation could cause anal fissures.

As to prostatitis, Dr. Persing admitted that during his exam he only noted swelling and not inflammation. He then admitted that a diagnosis of prostatitis could only be made if the doctor notes inflammation. Further, he admitted that he could not perform the complete examination of A.V. necessary to make this diagnosis due to the tenderness of A.V.'s prostate. Throughout his cross-examination, Dr. Persing admitted that this diagnosis was highly suspect due to the limited exam. Finally, as to inguinal adenitis, Dr. Persing admitted that this medical issue could have been caused from something as simple as a simple ingrown toenail while Dr. Williams admitted it could be caused by a "nick on the top of the leg."

From a complete view of the record it is apparent that all the points Dr. Lindberg would raise as an expert were in fact raised in the record. More importantly, they were raised by medical experts who testified in the form of opinions. The simple fact that one of the defense's experts did not match exactly the extensive and impressive

qualifications of Dr. Persing does not change the fact that the defendants' medical experts testified about the same issues listed in Dr. Lindberg's declaration. Not only did Causey's trial counsel cross-examine Dr. Persing as to the very issues raised in Dr. Lindberg's declaration, Causey's counsel presented other direct medical testimony through Dr. Williams and Dr. Zoog on precisely the same issues.[4] Therefore, Causey's counsel were not ineffective for not presenting or consulting with an independent specialized expert in sexual abuse because the defense thoroughly covered these issues through cross-examination of the Government's experts and presented the direct examination of multiple medical experts called to testify in Causey's case-in-chief.

In addressing <u>Lindstadt</u>, it is clear from a review of the record that Causey's trial counsel knew the subject matter of sexual abuse. The information elicited on cross-examination of Dr. Persing shows that trial counsel knew about issues relating to anal fissures and possible other causes of anal fissures, such as constipation, the medical criteria for diagnosing prostatitis and the necessity to find inflammation, as well as other possible causes of inguinal adenitis. It appears that trial counsel did an admirable job educating themselves on every point detailed by Dr. Lindberg and used that knowledge in examining witness at trial. <u>Lindstadt</u>, therefore, is not applicable here.

Even if the Court were to find that trial counsel's performance was somehow deficient, the Court is still not persuaded that Causey was prejudiced by not calling an independent expert on sexual abuse. Causey asserts that outside the medical evidence,

---

[4] Cross-examination is, after all, the "greatest legal engine ever invented for the discovery of truth." <u>California v. Green</u>, 399 U.S. 149, 158 (1970).

the case was a "credibility contest between A.V. who alleged that Causey abused him, and Causey, who denied any sexual contact with A.V."[5] (Record Document 231-1 at 31). This statement is simply unsupported in the record. If Dr. Lindberg had been consulted before or testified at trial, it would not have changed the fact that Dr. Persing and Dr. Williams both testified, under oath as experts, that they saw anal fissures on G-3 and G-3a.[6] It would not have changed the testimony of McClain Causey, Causey's own son, saying the sleeping arrangement on the evening of the assault was "strange." It would not change the testimony of David Moore showing a *modus operandi* that Hitt and Causey worked with or the testimony of the Rushings. Lindberg's testimony would have been cumulative at best. Causey has not shown a reasonable probability of prejudice sufficient to undermine confidence in the outcome of this case.

<u>Failure to Investigate Evidence A.V. Had a Psychiatric Condition</u>

Causey's second claim of ineffective counsel is:

> "Though trial counsel was in possession of evidence indicating that A.V. had taken powerful anti-psychotic drugs and had been treated at state mental health facilities, he failed to adequately investigate A.V.'s psychiatric condition either by motion in federal court to subpoena A.V.'s medical records or by interviewing people who knew A.V. and were aware of his history of psychiatric medication and behavioral problems."

---

[5]"Determining the weight and credibility of the evidence is within the exclusive province of the jury." <u>U.S. v. Johnson</u>, 381 F.3d 506, 508 (5th Cir. 2004)

[6]The Court is also not convinced, to the point of undermining its confidence in the outcome of the trial, that Dr. Lindberg's medical opinions would have trumped the opinions of the actual examining physicians. "[E]xpert opinion is not binding on the trier of fact if there is reason to discount it." <u>White v. Estelle</u>, 669 F.2d 973, 977 -978 (5th Cir 1982)

(Record Document 231-1 at 33).

*Relevant Facts*

Causey now argues that at the time of A.V.'s testimony, he was taking 600 milligrams a day of "powerful anti-psychotic medicine that would both calm him down and assist him in recounting a coherent story of what had alleged [sic] happened to him." (Record Document 231-1 at 34). Further, Causey claims that the jury did not hear that at the time A.V. accused Causey and Hitt, it was "likely [he] suffered from a serious mental condition that impacted either his perception of reality or his truth telling, or both." (Record Document 231-1 at 35). Causey offers evidence that A.V. was taking an anti-psychotic drug in 2005, he had "previously taken Ritalin for being hyper," and was at one time on an antidepressant. See Id. Further, in May of 2004 A.V. was being treated with Zyprexa and Concerta. Zyprexa is a "psychotropic medication" and Concerta is used to treat Attention Deficit Hyperactivity Disorder. (Record Document 231-1 at 36). Finally, three people with whom A.V. interacted stated that A.V. was a liar. These three people were the Adamses, A.V.'s caretakers before the Rushings, and a neighbor of the Rushings who helped A.V. with homework. With this information, Causey has now consulted two experts who claim that based on these medications and descriptions of A.V., "*suggest* that he *may* have been suffering from bipolar disorder, schizophrenia or a serious conduct disorder."(Record Document 231-1 at 38) (emphasis added).

*Trial Counsel Were Not Ineffective*

Causey argues that trial counsel were ineffective because they did not properly investigate A.V.'s medical records, interview witnesses who could shed light on A.V.'s behavioral issues, and investigate A.V.'s psychiatric condition. (Record Document 231-1 at 38). Causey's trial counsel did investigate A.V.'s mental health in state court by requesting A.V.'s mental health records. The Mississippi trial court did turn over portions of A.V.'s medical history. (Record Document 231-1 at 39). The Court is not persuaded by Causey's argument that, because they did not obtain a better result through this state court request, that their performance fell below an objectively reasonable standard. The Court is also not persuaded that there was anything in A.V.'s medical records at the time of trial that would have put Causey's trial counsel on notice that A.V. suffered from anything other than already diagnosed post-traumatic stress disorder relating to Causey and Hitt's molestation.

Further, Causey argues that A.V.'s other caretakers, the Adamses, should have been interviewed. Had they been, Causey contends that counsel would have discovered that A.V. was a liar and violent. (Record Document 245 at 19). However, the Court notes that both of the Rushings testified that A.V. was both a liar and violent. When asked on the stand both Charlene and Jimmy Rushing stated that they would not believe A.V. under oath. (Trial Transcript Vol. III at 617, 645). Further, Charlene testified regarding the violent behavior she witnessed from A.V. while he lived with them. (Trial Transcript Vol. III at 610). In fact, the jury heard that after an argument with Charlene Rushing, A.V. spent two weeks in youth court. (Trial Transcript Vol. III at 614). The jury

also heard of threats A.V. made to Charlene while they lived together, including one to take her friend, Scott Hitt, away from her. (Yet that threat was never mentioned during the hours-long interview of the Rushings by James Podboy, *infra*.) (Trial Transcript Vol. III at 610, 615). Trial counsel's failure to investigate the possibility of other witnesses is not objectively unreasonable. They had interviewed the caretakers of A.V. during the most critical time, i.e., during the time that A.V. accused Causey and Hitt of sexual abuse.

Causey finally argues that, having supplied the Court with two experts asserting that A.V. suffered from a serious psychiatric condition, trial counsel were ineffective for not bringing this diagnosis to the jury's attention. The Government properly recognizes that the only diagnosis made of A.V. to the point of trial was post-traumatic stress disorder. (Record Document 236-1 at 29). At the restitution hearing for A.V., two witnesses explained that A.V. was taking Seroquel as a result of A.V.'s post-traumatic stress disorder. Further, the majority of the information Causey's two experts relied on were things that occurred after the sexual abuse and after A.V.'s accusations detailing the abuse. (Record Document 231-2 at 58, 64).[7] Specifically, Causey points to A.V.'s use of Seroquel which began April of 2005, a violent outburst by A.V. that prompted the

_____

[7]Both experts basically reviewed the same material: "a transcript of a hearing on September 29, 2005, in connection with the criminal case against Dr. Causey; affidavits from Carol Adams, David Adams, and Terry Cox regarding the behavior of the juvenile known in court records as 'A.V;' A.V.'s Mississippi Region 8 Mental Health Intake form dated October 29, 2003; a report of an interview at Region 8 with A.V. on December 14, 2004; a report if a medical examination of A.V. Persing dated November 14, 2003; and a letter from Dr. Michael Nowicki to Dr. Persing regarding A.V. dated May 14, 2004." (Record Document 231-2 at 65).

Seroquel prescription, and A.V.'s use of Zyprexa and Concerta in May of 2004 as evidence of this new diagnosis. (Record Document 231-1 at 35). Causey's experts' suggestion that A.V. suffered from bi-polar disorder or schizophrenia appear to be based mainly on the prescription of 600 milligrams of Seroquel and Zyprexa and affidavits showing A.V. was a liar and violent. (Record Document 231-1 at 37). However, both of these drugs were prescribed to A.V. after the abuse took place. One of Causey's experts, Dr. Marc Colon, argues that 600 milligrams of Seroquel is too high to be prescribed for post-traumatic stress disorder. (Record Document 231-2 at 60). Combined with Zyprexa, it "suggests that he may have been suffering from bipolar disorder, schizophrenia or a serious conduct disorder." See Id. Causey's second expert, Dr. Scott Stanley, concurs with this analysis and suggested "diagnosis." (Record Document 231-2 at 64-68).

The Court notes that Causey does not introduce this as new evidence necessitating a new trial. Rather Causey contends that the above after-the-fact medical opinions prove his trial counsel's performance was objectively unreasonable for not investigating these supposed mental health issues. A review of both Dr. Colon and Dr. Stanley's declarations attached to the motion before the Court makes it clear that A.V.'s medically prescribed use of Seroquel and Zyprexa largely influenced their ultimate conclusions. However, this medication was prescribed after a diagnosis of post-traumatic stress disorder and after both the sexual molestation and the accusations of that abuse were made. The only way Causey's trial counsel could have discovered this medication was if it received more of A.V.'s medical records or interviewed A.V.'s

caretakers at the time it was prescribed. (Record Document 236-1 at 39). As already noted above, Causey's trial counsel were not objectively unreasonable for not reviewing any further medical records. As to interviewing A.V.'s caretakers, the Adamses, from before moving in with the Rushings, it is not objectively unreasonable for Causey's trial counsel to forgo interviewing them as it is not unreasonable to expect that information gained through this interview would be irrelevant and/or cumulative for the trial. Further, as the Government points out, Dr. Stanley had been privy to this case for quite some time but only now does he make this non-examination, records only diagnosis. (Record Document 236-1 at 33). If the information Dr. Stanley reviewed before his trial testimony did not put him on notice to investigate the possibility of a psychiatric disorder, it seems reasonable that Causey's trial counsel were not on notice either.[8]

Even if the Court did find that not investigating this supposed disorder before or even during trial was ineffective, the Court is still not persuaded that this would have changed the verdict. As the Government states in its response to this motion, Government's counsel could easily have argued that the only actual diagnosis of A.V. was post-traumatic stress disorder caused by Causey and Hitt's sexual abuse A.V.

---

[8]While Causey attempts to downplay this argument, stating that Dr. Stanley was looking for sexual abuse and not psychotic disorders, it appears that if the evidence was so strong that it was objectively unreasonable for Causey's trial counsel to have failed to recognized the presence of a disorder, surely an expert in forensic psychiatry and child adolescent psychiatry should have been placed on notice as well. Under these circumstances, it is reasonable to conclude that Dr. Stanley did not even suspect the presence of a psychiatric disorder in A.V. at the time of his trial testimony.

(Record Document 236-1 at 39).[9] It is also important to note the Rushings testified that they would not believe A.V. under oath. Further, there was evidence of threats A.V. made to the Rushings, including the one regarding taking Hitt away from Charlene Rushing that would allow a juror to doubt A.V.'s credibility. Causey also fails to note that Barbara Varner took the stand in this case. She was A.V.'s teacher at the time of the accusations. She testified that, based on her personal observations, A.V. had no "major behavior problems" and was never disrespectful. (Trial Transcript Vol. II at 234). It is not unreasonable to conclude that the testimony of a school teacher at a time relevant to the accusations would outweigh the testimony of the Adamses or the Rushings neighbor who did not interact with A.V. as much as Ms. Varner did. If the only purpose of the evidence of this supposed mental disorder is to attack the credibility of A.V. as a violent liar, the defense offered a multitude of evidence specifically aimed at attacking A.V.'s credibility on these issues. There is no indication that this unproven, speculative disorder would have been the exact piece of evidence to change outcome of the trial. Further, there is ample and overwhelming evidence in the record that corroborates A.V's story, including, for example, the testimony of McClain Causey, Dr. Persing, and David Moore.

---

[9]The Court notes that Dr. Colon found that the evidence "suggests" that A.V. had a mental disorder other that post-traumatic stress disorder. "Suggesting" a diagnosis is not the same thing as finding of "more probable than not." This certainly effects the weight that the diagnosis would have been given in court and therefore lessens the chance that this supposed diagnosis would have undermined the outcome of the trial.

<u>Failure to Object to Use of Co-Defendant's Confession</u>

Causey next argues that his trial counsel were ineffective in failing to object to the prosecutor's use of Hitt's confession against Causey. (Record Document 231-1 at 45). Causey alleges that the Government improperly used Hitt's confession during the cross-examination of several witnesses (including Causey himself) and his trial counsel failed to object to any of this. <u>See Id</u>. Hitt never took the stand. <u>See Id</u>. Causey cites <u>Mason v. Scully</u>, 16 F.3d 38 (2d Cir. 1994) for the proposition that his trial counsel were ineffective, where the Second Circuit found that the defendant's constitutional right to confrontation was violated and that the defendant's trial counsel were ineffective for failing to object to the use of a non-testifying co-defendant's confession. <u>See Id</u> at 43-44.

However, reviewing Causey's conviction, the Fifth Circuit held:

> Causey also alleges a *Bruton* violation in the use of Hitt's confession in (1) the cross-examination of Causey, (2) the cross-examination of one of Causey's witnesses, and (3) closing argument. The Sixth Amendment is not violated in these circumstances because Hitt's statement as elicited from Gammill on direct and, as used on cross-examination and in closing, did not include *any* references to Causey, and Causey had an opportunity to cross-examine Gammill. Therefore, the court is not faced with a situation where Causey cannot confront a witness brought against him. We reject Causey's *Bruton* challenge.

<u>U.S. v. Hitt</u>, 473 F.3d 146, 160 (5th Cir. 2006).

Unlike <u>Mason</u>, where that Court found both that use of the confession was unconstitutional *and* that failure to object to its use was evidence of ineffective counsel, Causey's direct appeal disposed of this Constitutional claim. The use of Hitt's

confession did not violate Causey's constitutional right of confrontation and therefore an objection by trial counsel would have been fruitless. See Sones v. Hargett, 61 F.3d 410, 415 n.5 (5th Cir. 1995).

Causey further asserts that his counsel were ineffective for not putting Hitt's later denial of the confession on the record. The Court is not persuaded that this failure was unreasonable. Defense counsel for Hitt cast doubt on the veracity of the confession at length. (Trial Transcript Vol. II at 412-42). Hitt did not take the stand. It was not unreasonable for Causey's defense counsel to, either by strategic decision or indecision, leave Hitt's denial of his confession alone.

### Failure to Lay Proper Foundation to Discuss Prior Accusations of Abuse

Causey next accuses his trial counsel of being ineffective for failing to properly lay a foundation to be able to question A.V. about prior false allegations of sexual abuse. (Record Document 631-1 at 58). Causey asserts that his trial counsel joined a notice of intent to file evidence under Federal Rules of Evidence 412.[10] (Record

---

[10]"Rule 412. Sex Offense Cases; Relevance of Alleged Victim's Past Sexual Behavior or Alleged Sexual Predisposition:
(a) Evidence generally inadmissible.– The following evidence is not admissible in any civil or criminal proceeding involving alleged sexual misconduct except as provided in subdivisions (b) and (c):
    (1) Evidence offered to prove that any alleged victim engaged in other sexual behavior.
    (2) Evidence offered to prove any alleged victim's sexual predisposition.
(b) Exceptions.–
    (1) In a criminal case, the following evidence is admissible, if otherwise admissible under these rules:
        (A) evidence of specific instances of sexual behavior by the alleged victim offered to prove that a person other than the accused was the source of semen, injury or other physical evidence;
        (B) evidence of specific instances of sexual behavior by the alleged victim

Document 631-1 at 59). However, Causey argues, it was objectively unreasonable to only argue that the evidence was admissible to prove it was not Causey or Hitt who abused A.V. but whomever A.V. previously accused. See Id. Causey asserts that these accusations are admissible as prior false allegations of abuse or as evidence of credibility. See Id at 59, 61.

At the hearing on this issue, the Government argued that they had cited cases that "stand for the proposition that you can exclude a previous even allegedly false allegation of rape." (Hearing on Motions Transcript Vol. II at 271). It is clear the Court made its ruling excluding the previous accusations with knowledge that they could be argued to be false. Therefore, it was not unreasonable for defense counsel to not raise this argument again. Further, it is clear that the Court had discretion to exclude this

---

with respect to the person accused of the sexual misconduct offered by the accused to prove consent or by the prosecution; and
(C) evidence the exclusion of which would violate the constitutional rights of the defendant.
(2) In a civil case, evidence offered to prove the sexual behavior or sexual predisposition of any alleged victim is admissible if it is otherwise admissible under these rules and its probative value substantially outweighs the danger of harm to any victim and of unfair prejudice to any party. Evidence of an alleged victim's reputation is admissible only if it has been placed in controversy by the alleged victim.
(c) Procedure to determine admissibility.–
(1) A party intending to offer evidence under subdivision (b) must–
(A) file a written motion at least 14 days before trial specifically describing the evidence and stating the purpose for which it is offered unless the court, for good cause requires a different time for filing or permits filing during trial; and
(B) serve the motion on all parties and notify the alleged victim or, when appropriate, the alleged victim's guardian or representative.
(2) Before admitting evidence under this rule the court must conduct a hearing in camera and afford the victim and parties a right to attend and be heard. The motion, related papers, and the record of the hearing must be sealed and remain under seal unless the court orders otherwise."

evidence under Federal Rule of Evidence 403 because the evidence would be unfairly prejudicial and could confuse the jury. See United States v. Tail, 459 F.3d 854 (8th Cir. 2006). The Court ruled the evidence inadmissible pretrial. Thus, it is clear Causey's trial counsel's performance was not objectively unreasonable.

<u>Failure to Object to Expert's Testimony</u>

Causey argues that, during Dr. Seiden's testimony, his counsel were ineffective for allowing opinion testimony regarding specific percentages of accusers who make false allegations. (Record Document 231-1 at 66). It is important to note, as the Government does in their response, that Dr. Seiden never referred to A.V. individually but spoke generally about child abuse accusers. Dr. Seiden admitted that he had never met with either the victim or any defendant. (Trial Transcript Vol. III at 528). Causey cites to <u>Snowden v. Singletary</u>, 135 F.3d 732 (11th Cir. 1998). However, in <u>Snowden</u>, the testimony that was elicited was the expert discussing the particular victim and her credibility.[11] <u>See Id</u> at 738. Further, since the expert in <u>Snowden</u> had examined the victim, when he testified about a percentage of truthful accusers, he was including the particular victim in that statistic. Dr. Seiden was asked if he was "here to tell the jury

---

[11]"Q: Doctor, when you interviewed [the child witness] and she told you about the incident of sexual abuse, did you find any evidence in your interview that [she] was unable when she described in detail those incidences in detail that she was unable to tell fact from fantasy?
A: I did not.
Q: Did you find any evidence in your interview to indicate to you that when [the child] told you about how she was sexually abused by Grant her babysitter, did you find any evidence to indicate that [she] did not realize the significance of the statements she was making?
A: I did not." <u>Snowden v. Singletary</u>, 135 F.3d at 739.

who is telling the truth and who is lying." Dr. Seiden responded, "No, sir. I'm not qualified to do that." (Trial Transcript Vol. III at 528). Dr. Seiden never even discussed A.V. except when he admitted his testimony was not based on any interaction with or personal examination of A.V. individually. Therefore, Dr. Seiden did not specifically address the credibility of A.V., and, in fact, succinctly stated that he was not qualified to do so. Causey's trial counsel were not ineffective as an objection would have been properly overruled.[12]

<u>Failure to Investigate Influence of Court Appointed Special Advocates</u>

Causey alleges that Mary Taylor and Mississippi's Court Appointed Special Advocates ("CASA") "funded or otherwise improperly influenced the government's investigation and prosecution of the case against Dr. Causey." (Record Document 231-1 at 68). The Government replies showing that this issue was explored and answered at trial through the testimony of the relevant witness. (Record Document 236-1 at 50-52). Based on the showing by Causey, there is nothing in the record to allow this court to presume such an investigation would have brought about any improper influence and as such, Causey's trial counsel were not ineffective for not investigating it further.

---

[12]In regards to Dr. Stanley's testimony, Causey argues that preventing Dr. Stanley from discussing the credibility of A.V. makes the testimony of Dr. Seiden even more profound. Dr. Stanley was stating that he would expect minor inconsistencies but not major inconsistences in reports of sexual abuse. After he stated this, the Court warned defense counsel that it could not continue down this line of questioning to discuss the credibility of A.V. The Court was correct with this warning as it would have been inappropriate for defense counsel to begin discussing the credibility of A.V.'s story in particular. Further, Dr. Stanley's testimony has no bearing on whether or not Causey's trial counsel were ineffective for not objecting to Dr. Seiden's testimony.

<u>Failure to Investigate A.V.'s Claim of Drugging</u>

Causey alleges his trial counsel were ineffective for not investigating the drug that A.V. testified Causey and Hitt administered to him before sexually abusing him. (Record Document 231-1 at 69). Causey testified that he had never heard of such a substance and his research had failed to discover anything like it. (Record Document 236-1 at 53). Based on the showing made by Causey, there is no reason to think that determining the identity of this substance would have altered the outcome of the case. Causey, as a physician, personally researched this issue and testified about his research. Therefore, trial counsel were not ineffective for failing to investigate this drug any further.

## II. <u>Brady</u> Material

Causey accuses the Government of withholding information regarding A.V.'s psychiatric condition and medication as well as withholding the involvement of CASA in their investigation.

<u>Brady v. Maryland</u> requires that the prosecution in a criminal case disclose material evidence that is favorable to the defense. 373 U.S. 83 (1963). The purpose of <u>Brady</u> rule is to "ensure that a miscarriage of justice does not occur." <u>United States v. Bagley</u>, 473 U.S. 667, 675 (1985). "Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." <u>See Id</u>.

<u>Government's Failure to Disclose A.V.'s Prescription of Seroquel</u>

Causey asserts that "the Government undoubtedly knew, when A.V. testified at trial, that he was being medicated with a high dosage of the psychotropic drug Seroquel." (Record Document 231-1 at 71). Without this information, Causey argues that he was unable to properly confront A.V. during the trial. Causey states that with this information, he could have "demanded that A.V. testify in an un-medicated state so that the jury could observe his true demeanor."[13] (Record Document 231-1 at 73). Further, with this information Causey feels it would have alerted his experts to the fact that A.V. suffered from a "much more serious psychiatric condition than post traumatic stress disorder." <u>See Id</u>.

The Government responds by stating that Causey's <u>Brady</u> challenge is procedurally barred. The Government argues that under the reasoning of <u>United States v. Segler</u>, Causey bears the burden of showing both cause for not raising this issue on appeal and actual prejudice resulting from the error. 37 F.3d 1131, 1133 (5th Cir. 1991). Causey responds stating that the reason he did not raise this issue on appeal is that his appellate counsel were unaware of the information even though his trial counsel were. (Record Document 245-1 at 26-27). While the Court is hesitant to agree that trial counsel's withholding information from appellate counsel constitutes "cause" under

---

[13]This "demand" for requiring testimony from A.V. in an "unmedicated state" borders on ludicrous. Of all the case law that Causey cites for this proposition, none come close to the facts at hand. Causey's demand to force a minor to be taken off of medication prescribed to him to curtail the effects of post traumatic stress disorder suffered by that minor as a result of repeated sexual molestation inflicted at the hands of Causey is not an argument likely to succeed in many courtrooms, especially this Court.

Segler, it is unnecessary for the Court to decide this issue because the Government did not violate the Brady rule in this set of circumstances.

In United States v. Wilson, a key prosecution witness was taking three anti-psychotic drugs at the time of his testimony. 116 F.3d 1066 (5th Cir. 1997). The Fifth Circuit held that even though the defendant "suggests that the government should be deemed to have had constructive knowledge based on a broad duty to investigate, a prosecutor has no duty under Brady to investigate the mental state of its witnesses in order to uncover impeachment evidence for the defense." See Id at 1082. Therefore, since Causey has no evidence the Government had actual knowledge A.V. was taking this medication, it did not fail to disclose any Brady material.

Causey also makes the bold allegation that A.V.'s "guardian ad litem's knowledge can and should be imputed to the government for purposes of Brady obligations since her actions in this case clearly constitute those of a member of the prosecution team." (Record Document 245 at 25). Mary Taylor was A.V.'s guardian ad litem pursuant to a Mississippi court order. See Id. There is nothing in the record to support Causey's accusation that Taylor was "subject to the prosecutor's control." See Id. In fact, quite the opposite is true. Taylor testified that her role "is the best interet of the child. I am not an attorney, so I just represent his best interest." (Trial Transcript Vol. I at 204). Further, the organization that she is affiliated with, Mississippi Court Advocacy and Justice, is a private, nonprofit agency. (Trial Transcript Vol. I at 211). For these reasons, the Government did not violate Brady in this instance as they had no knowledge of A.V.'s

prescribed medication and, therefore, the information of Mary Taylor cannot be imputed to them.

<u>Government's Failure to Disclose CASA's Funding and Influence on the Proceedings</u>

Causey argues that <u>Brady</u> was violated because he believed the Government knew that CASA played a hand in funding and influencing the trial but the Government did not disclose this information to Causey. (Record Document 231-1 at 75).The Court again agrees with the Government that "all parties fully explored the relationship between CASA and the University of Mississippi Medical Center. The defendant has not established how any additional information about CASA's role in the investigation would be exculpatory or impeachment material that would fall within the purview of <u>Brady</u>." (Record Document 236-1 at 57).

III. Sixth Amendment Violated During Dr. Stanley's Testimony

The final allegation raised by Causey is that he was deprived of his Sixth amendment constitutional right to present a defense when Dr. Stanley was not allowed to contradict the testimony of Dr. Seiden. Causey alleges that the Court inappropriately cut off defense counsel when Dr. Stanley was about to contradict the findings of Dr. Seiden. (Record Document 231-1 at 75). As previously discussed in relation to Dr. Seiden's comment regarding the general credibility of sexual abuse victims based on medical studies and literature, Dr. Stanley's testimony was coming impermissibly close to discussing A.V.'s case individually. The Court stopped Dr. Stanley when this question was asked: "And what is the problem that these major inconsistencies cause you?" (Record Document 231-1 at 77). The Court was within its discretion to warn counsel

that it could not discuss the credibility of A.V. directly.[14] Trial counsel had already established through Dr. Stanley's opinion that minor inconsistencies could be normal but not major inconsistences.  (Trial Transcript Vol. III at 592-592). The Court's warning to counsel was legally correct and the choice of Causey's trial counsel to leave that area of questioning was not unreasonable. Additionally, no proffer was made, likely because Dr. Stanley had already made the point he, and Causey's trial counsel, wanted to make.

Dr. Seiden testified that false allegations of sexual abuse are very rare, Dr. Stanley was able to testify that he agreed but that major inconsistencies concerned him. Further, Causey's trial counsel were able to show inconsistencies in A.V.'s story during cross-examination of A.V. Causey's trial counsel were free to connect up this issue during closing argument and had ample testimony from which he could argue. Causey's Sixth Amendment right to present a defense was not violated by court-imposed limitations of Dr. Stanley's cross-examination pursuant to the Federal Rules of Evidence.[15]

---

[14]"The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise." Fed R. Evid. 608(a)

[15]"Control by court. The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." Fed. R. Evid. 611(a)

**CONCLUSION**

Based on the foregoing conclusions, Causey's trial counsel were not constitutionally ineffective, the Government did not violate the <u>Brady</u> rule, and Causey's Sixth Amendment rights to confrontation of a witness and to present a defense were not violated.

These findings are clear from the record and the briefs filed by the Government and Causey. Causey's request for an evidentiary hearing is **DENIED**.

Accordingly, Dr. William A. Causey's Motion to Vacate his sentence pursuant to 28 U.S.C. § 2255 is **DENIED**.

THUS DONE AND SIGNED at Shreveport, Louisiana, this 29th day of September, 2011.


_____
S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE